# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
February 28, 2012 Session

## STATE OF TENNESSEE v. CARLOS RADALE CORNWELL

**Appeal from the Criminal Court for Knox County**
**No. 89044      Richard R. Baumgartner, Judge**

**No. E2011-00248-CCA-R3-CD - Filed October 25, 2012**

Appellant, Carlos Radale Cornwell, appeals his conviction of second degree murder and resulting sentence of thirty-five years. Appellant cites the following errors: (1) the State failed to adequately preserve evidence; (2) the trial court erred in permitting the State's medical expert to testify beyond the scope of her expertise; (3) the trial court improperly allowed two of the State's witnesses to testify as experts; (4) the trial court erred in allowing improper testimony of certain lay witnesses; (5) the State improperly argued a theory in its closing argument that was not supported by the evidence; (6) the State failed to provide audio tapes of witness interviews in a timely fashion; (7) the trial court erred by allowing an officer to read aloud the affidavit of complaint supporting a domestic violence warrant taken by the victim against appellant; and (8) the trial court erred in sentencing appellant as a Range II offender and in determining the length of appellant's sentence. Discerning no error, we affirm appellant's conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Mark E. Stephens, District Public Defender; John Halstead and Robert Edwards, Assistant Public Defenders, Knoxville, Tennessee, for the appellant, Carlos Radale Cornwell.

Robert E. Cooper, Jr. Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts

A. Procedural History

A Knox County Grand Jury indicted appellant for one count of first degree murder of his wife, Leoned Cornwell. The trial court appointed the Knox County Public Defender to represent appellant. After a jury trial, the jury convicted appellant of the lesser-included offense of second degree murder.

This case involves a motor vehicle fatality where appellant struck the victim, his wife, with his automobile. Appellant did not challenge the fact that he struck the victim with his automobile. The primary dispute involved whether appellant moved his vehicle forward to strike the victim, or whether, as he contended, he accidentally struck the victim as she walked behind his vehicle. As such, evidence tending to support either theory was important. Thus, prior to trial, appellant filed a motion based on *State v. Ferguson*, asking that the trial court dismiss the indictment against him.[1] *Ferguson* provides the legal analysis to be employed by the court when an accused alleges loss or destruction of evidence by the State.

Appellant argued to the trial court that after officers impounded and examined his vehicle, they improperly stored it in an unprotected outdoor area, leading to material alteration of evidence. Appellant maintained that his expert would contend that it was not feasible for the State to draw the conclusions it reached based on the documentation it provided to appellant and that independent visual inspection by appellant's expert was necessary, yet impossible. Thus, appellant argued that he could not defend himself against the indictment. The State responded that it adequately preserved the evidence photographically and made the photographs available to appellant. After hearing testimony from Gillis Dewayne Terry from the Knoxville City Impound Lot and accident reconstructionists James Alan Parham and L.B. Steele, III, the trial court denied appellant's motion.

In a subsequent pre-trial hearing, the parties addressed issues pertaining to the expert testimony of Dr. Darinka Mileusnic-Polchan, Joe Cox, and L.B. Steele. At that time, the trial court heard appellant's argument regarding the anticipated testimony of his neighbors Anthony and Stephanie Anderson. On the morning of trial, appellant offered further argument about the expert testimony and the Andersons' testimony.

---

[1] *See generally State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999)

-2-

## B. Facts from Trial

Stephanie Anderson testified that she was a neighbor of the Cornwells at Morningside Hills Apartments. She lived next door to appellant and the victim with her husband and daughter. The Andersons' apartment shared a common wall with the Cornwells' apartment. On March 5, 2008, Ms. Anderson was awakened at approximately 4:30 a.m. by the Cornwells' arguing. Appellant was screaming at the victim, calling her profane names such as, "B***h. You stupid b***h. You stupid MF." Ms. Anderson believed that appellant sounded angry. Later that day, Ms. Anderson heard something about a death that prompted her to call Detective Steve Still. He interviewed Ms. Anderson at her home the following day. Another investigator accompanied Detective Still and simultaneously interviewed Mr. Anderson in a different room.

Anthony Anderson, Stephanie Anderson's husband, confirmed that he heard appellant yelling at the victim, including a great deal of profanity and cursing. He also heard appellant threaten the victim by saying, "Stupid, mother f****er, you know that I'll kill you."

Cebra Griffin, Sr., testified that he worked with appellant at Smokey's restaurant at the University of Tennessee. Mr. Griffin was at work around 5:00 a.m. on March 5, 2008, and saw appellant arrive at approximately 5:25 a.m. Appellant was looking for their supervisor. Mr. Griffin believed that appellant left around 5:30 or 5:45 a.m. According to Mr. Griffin, appellant did not appear to be upset when he left.

Angelel Williams testified that she worked at Smokey's with appellant and Mr. Griffin. She was at work on March 5, 2008. Appellant was already there when she arrived at 5:30 or 5:45 that morning. He was in a good mood and did not indicate that he and the victim had argued. Ms. Williams received a call for appellant. She did not see him leave Smokey's.

Sandra Moore testified that she also lived in Morningside Hills Apartments. Ms. Moore's apartment shared a common wall with the Cornwells' apartment. On March 5, 2008, she awoke at 5:30 a.m. and did not hear any yelling or screaming as she was getting dressed for work. Ms. Moore left her apartment around 6:00 a.m., when she passed appellant and the victim. They were walking toward their car. She heard them bickering but did not describe it as yelling.

Titonia Sawyer testified that she made a transaction using the ATM at ORNL Federal Credit Union at 6:22 a.m. on March 5, 2008. She approached the credit union from a back street, the name of which she did not recall. From the direction Ms. Sawyer approached, she was facing the teller lanes. Ms. Sawyer noticed a car just in front of the teller lanes. She

drove around the credit union to the ATM. The car she previously noticed pulled around, also. The driver of the vehicle approached in such a way as to leave a space between Ms. Sawyer's car and the other vehicle. Ms. Sawyer's window was rolled down and the driver's side door was ajar, allowing better access to the ATM. Ms. Sawyer did not hear arguments or music coming from the other car. From her vantage point, Ms. Sawyer could see that a male was in the driver's seat. She could not clearly see anything else until a woman exited the front passenger side of the vehicle. After the passenger exited the vehicle, the passenger looked down into the car. The female passenger did not appear agitated; Ms. Sawyer thought the woman was simply looking for her purse. The next time Ms. Sawyer looked back, the woman had both passenger side doors open. Ms. Sawyer became very nervous, thinking that she was about to be ambushed. When Ms. Sawyer received her ATM receipt, she left the credit union by the same route she arrived. The other vehicle was in the same location, but she could no longer see the woman.

Ms. Sawyer then went to work. While at her desk, Ms. Sawyer watched the local news on her computer. A news story reported that a hit-and-run had occurred at the ORNL Credit Union at approximately 6:23 or 6:24 a.m. Ms. Sawyer checked her ATM receipt, and upon confirming that her transaction occurred at 6:22 a.m., she called the police. When she spoke with the investigator, he informed her that the police were looking for her. Ms. Sawyer viewed a photograph of where the vehicle was oriented after the incident. She stated that the other vehicle was farther "down," meaning toward the street, than where she last saw it.

Gail Cox testified that she, along with her husband, Devery Cox, and their two children were in their vehicle traveling west on Magnolia Avenue on the morning in question. They stopped at a traffic light and saw a man in the eastbound lane of the road walking toward the credit union. The man was waving his arms over his head and was screaming hysterically for someone to call 9-1-1. They traveled through a green traffic signal when they noticed the man was then in the median and was signaling them to stop or slow down. Mr. Cox pulled to the median, at which time the man shouted for them to call 9-1-1 because "someone had been hit." Mr. Cox moved their vehicle from the roadway into the parking lot of ORNL Credit Union and dialed 9-1-1. As soon as the Coxes entered the parking lot, Mr. Cox saw the victim on the ground behind a maroon car. Mr. Cox saw shoes, an umbrella, and a few other items. Shortly thereafter, Mrs. Cox moved their car to another area of the parking lot to clear the way for emergency vehicles.

Mr. Cox spoke with the 9-1-1 operator at first, but because Mr. Cox was frantic and yelling, Mrs. Cox took the telephone and began to inform the operator about the incident. The victim's face was full of blood. One of her arms was contorted in such a way that it

appeared it may not have been attached to the victim's body. The victim was breathing but not consistently. She would, at times, try to catch her breath. The victim's eyes were open.

Appellant was frantically running about, saying that he could not believe this was happening and that he hoped the victim was okay. Appellant informed Mrs. Cox that he and the victim were arguing when the victim exited the vehicle. Mrs. Cox gave a statement to Detective Still later that morning. She stated that appellant told her that the victim started walking immediately after exiting the vehicle, so he shifted the car into reverse and began backing up without realizing that he ran over the victim. When appellant exited the vehicle, he observed that the car was on top of the victim. Knowing that he had to move the car, he got back into the vehicle in order to move it off of the victim's body.

Mrs. Cox testified that she advised appellant to collect the victim's purse and debit card, which were on the ground, and move the items out of the way for emergency personnel. Mrs. Cox noted that one of the victim's shoes was in close proximity to her body, while the other shoe was farther down the driveway of ORNL Credit Union. She recalled that someone put the victim's shoes in the trunk of appellant's car.

Mr. Cox testified that he was more concerned about the victim than the appellant. The victim's eyes were open and she was gasping for breath. Mr. Cox was anxious for 9-1-1 to arrive and save the victim's life. Mr. Cox was worried that the victim might go into shock, so he gathered jackets from appellant, Mrs. Cox, and their son to cover the victim. As Mr. Cox was on his knees beside the victim, appellant was running around, hysterical, saying, "Oh my God, oh my God," "I need help," "What have I done?" and "What am I going to do?" Mr. Cox told appellant to calm down. At some point, Mr. Cox asked appellant to come over to where the victim was lying and call her name to see if she would respond. The victim died before emergency personnel arrived on the scene.

Stacy Foster testified that she was employed as the vice-president supervising the security and fraud department at ORNL Federal Credit Union. Ms. Foster confirmed that the victim had an account with the credit union. She provided video footage from the surveillance cameras fixed on the ATM at the credit union at the time of the victim's death. From the angle of the camera at the ATM, one could see approaching headlights. The camera recorded a customer making an ATM transaction at 6:21 a.m. on March 5, 2008. Ms Foster identified a second set of headlights in the video footage beginning at 6:22 a.m. However, neither appellant's vehicle nor the victim were visible in the footage.

Steve Still, an investigator with the Knoxville Police Department's violent crimes unit, previously served as a fatal accident investigator. Detective Still completed training to investigate traffic fatalities but was not an accident reconstructionist. He testified that

accident reconstruction involves formulas and more technical issues, while fatal accident investigators make determinations based on the evidence at the scene, witness interviews, and toxicology reports.

On his way to work on March 5, 2008, Detective Still responded to an incident on Magnolia Avenue. The police department's reconstructionists worked the fatalities but often called investigators to assist in interviewing witnesses. Detective Still's duty at the scene was to interview the witnesses. At some point, the status of the incident changed from being a traffic accident to "possibly something more." When he arrived on the scene, Detective Still spoke with officers to obtain a basic understanding of what had happened. As he walked around the scene and the vehicle, someone pointed out that blood appeared to be under the front of the car. The spot of blood was located on a guard or cross-piece some distance farther back from the front of the car. Detective Still would have expected to see damage to a vehicle that struck a pedestrian but observed no damage to the hood or the trunk of appellant's car. He did, however, observe drops of blood, pieces of clothing, and a brownish mark that appeared to be skin near the sidewalk of the parking lot. Detective Still asked Mr. Cox to meet him at the police department to give a statement and asked officers to transport appellant to the department.

After informing appellant of his *Miranda* rights, Detective Still interviewed appellant. Detective Still videotaped and tape-recorded the interview. In appellant's statement to Detective Still, appellant said he thought he and the victim might be splitting up. Appellant and the victim had an issue regarding car payments. Appellant went to work on the morning of the incident but left so he and the victim could make the car payment. They went to the ATM together, where they were behind another vehicle. According to appellant, the victim cursed him, exited their vehicle, retrieved her umbrella from the back of the car, and began walking toward Magnolia. Appellant backed up the vehicle to see where the victim was going, then accidentally ran over her. When appellant realized he struck the victim with the car, he pulled forward to get the car off her. Appellant stated that he did not mean to hit her and that it was not intentional. Detective Still pointed out to appellant that before he moved the vehicle, he should have checked underneath to see exactly where the victim was in relation to the tires. If the victim was between the two axles of the car, her body may have been in contact with the undercarriage but not necessarily being crushed by it. In that case, moving the vehicle off her would have injured her further.

Detective Still did not believe that appellant's version of the incident matched the evidence at the scene. Everything that Detective Still witnessed at the scene indicated that the victim's body was dragged in the opposite direction of what appellant told him. The blood under the front of the vehicle, between the front axle and the very front of the car, indicated that if appellant had indeed backed over the victim as he stated, he would have run

over her with both axles of the vehicle. Based on the level of jarring that appellant would have experienced in the car, running over the victim with both axles of the car would have indicated very aggressive driving. Appellant could offer no explanation for the blood on the bottom front of the car. Detective Still was troubled by the absence of directional marks supporting appellant's version of the incident. Detective Still contacted the Knoxville Police Department reconstructionists, Ron Trentham and L. B. Steele.

Detective Still charged appellant with first degree murder. He continued investigating the case and developing information with the accident reconstructionists. In conducting his investigation, Detective Still gathered information from the following sources: Anthony and Stephanie Anderson; the medical examiner, Dr. Darinka Mileusnic-Polchan; Titonia Sawyer; credit union personnel; a co-worker of appellant; and photographs and evidence from the credit union scene. Detective Still agreed with the experts' opinion, based on the evidence and condition of the vehicle, that the victim's center of gravity was below the hood or trunk line of the car. His conclusion indicated that the victim was already on the ground when appellant ran over her.

Officer Beth Goodman was an evidence technician with the forensic unit of the Knoxville Police Department. Her duties involved gathering evidence, documenting crime scenes, and taking photographs. Officer Goodman collected the victim's clothing and personal items from the forensic center where the victim's body was autopsied. The articles of clothing included a black "hoodie," a pair of pants, underwear, a white t-shirt, a denim jacket, socks, and a sports bra. Officer Goodman also collected the victim's jewelry and keys.

Officer Dan Crenshaw, a senior evidence technician at the Knoxville Police Department, responded to the scene at ORNL Credit Union. Officer Crenshaw believed that he was responding to an accident with an injury. When he arrived, he observed a vehicle with a body partially protruding from the rear of the car. The first thing Officer Crenshaw did was take photographs. He placed cones, markers, and numbered placards beside the evidence. He also photographed the inside of the vehicle. Officer Crenshaw saw blood spatter on the ground and blood on the undercarriage of the car around the radiator. He did not notice any damage to the hood, trunk or bumpers of the vehicle. Officer Crenshaw took several other photographs before Officer Joe Cox arrived at the scene to relieve him.

Lachrisa Clemmons was the victim's daughter. On the day of the incident, Ms. Clemmons expected her mother to take her to the orthodontist around noon. Ms. Clemmons tried repeatedly to reach the victim by telephone. She called the victim's employer, Food City, to find out if the victim had gone to work. She learned from an employee that her mother was not at Food City that day. When Ms. Clemmons was finished at work, she went

home, changed clothes, and took the trolley to the orthodontist. She persisted in trying to reach her mother. At 5:00 p.m., Ms. Clemmons arrived back at her home. A few minutes later, Detective Still knocked on her door and informed her that her mother had been killed earlier that day. According to Ms. Clemmons, the victim left appellant in January 2008 and stayed at the Hamilton Inn for about a week. Some time during that week, appellant stayed with the victim in the hotel while visitors from North Carolina stayed at their apartment. The victim later returned to live with appellant. Ms. Clemmons had previously seen her mother with a black eye in November 2006.

Officer Joe Cox of the Knoxville Police Department was working crime scene detail in 2008. His duties included taking photographs, collecting samples, collecting evidence, and analyzing evidence or sending the evidence away to be analyzed. When he arrived at the scene at ORNL Credit Union, he saw a maroon Infiniti in the parking lot and a deceased woman on the ground. He photographed the scene and collected blood samples. In addition to collecting blood spatter evidence, Officer Cox collected a cigarette lighter and a clump of hair from the scene. He later collected appellant's white t-shirt and pants. Officer Cox collected a pair of tennis shoes from the scene. The insole of one of the shoes had been dislodged, and the shoelace had been torn off. At the scene, Officer Cox noticed that the trunk of the vehicle was open. He ordered removal of the vehicle by a wrecker that pulled the vehicle onto the bed of the wrecker. The wrecker transported the vehicle to the police department's safety shop where it would be covered and placed on a lift so that investigators could examine the bottom of the car.

When officers examined the bottom of the vehicle, Officer Cox saw evidence that something had cleaned off parts of the underside of the car. He also observed stains that appeared to be blood on the underside of the car, as well as some other material. He swabbed the blood stains and forwarded them to the Tennessee Bureau of Investigation. The blood and "brush off" were located on the front passenger side of the automobile. Officer Cox swabbed blood stains from the front guard of the car, the rocker panel underneath the passenger-side door, the tubing guard, and the sway bar guard. He also obtained a blood swab from a back tire.

After extensive *voir dire* by appellant's counsel, during which Officer Cox offered information about his training, education, and experience, the trial court allowed Officer Cox to testify as an expert in blood spatter analysis. Officer Cox testified that he collected a blood sample from the gutter along Magnolia Avenue and from the sidewalk between Magnolia Avenue and the credit union. Officer Cox explained that when blood goes straight down at a ninety degree angle, the blood leaves a round impact mark with small marks called spines protruding from it. The blood spatter from the gutter was round with a degree of elongation. The spines pointed in a particular direction, which Officer Cox found useful in

determining the general direction of motion. The blood spatters were not high velocity; high velocity spatter would result in very small droplets, or misting. The blood on the sidewalk had large spines all pointing in the same direction. Officer Cox opined that, based on the direction of the spines on the blood splatter, the general direction of motion of the victim's body was toward the resting location of the victim's body, or toward the credit union from the street.

Officer Ron Trentham was in the motor unit of the Knoxville Police Department but also served as a traffic accident reconstructionist. After *voir dire*, the trial court allowed Officer Trentham to testify as an expert in accident reconstruction. In investigating an accident where the front of a vehicle struck a pedestrian, Officer Trentham would expect to see damage to the front bumper of the car and to the leading part of the hood. He would also expect to see damage on the hood or on the windshield. If a car backed up and struck a pedestrian, he would expect to see contact on the bumper or trunk deck area. Officer Trentham considered dirt on a vehicle to be very important in determining whether a vehicle made contact with another object or person. If he observed damage on a vehicle, it could be previous damage; however, if something touched a dirty vehicle, the impact of the object that touched it will disturb the dirt and make a smear. If a vehicle struck a pedestrian below his or her center of gravity, the body would either be pushed forward or it would go up onto the hood or the windshield. There should be some evidence, such as disturbed dirt, a dent, or contact damage. If a car struck a pedestrian above his or center of gravity, the car would push the pedestrian over and move on top of the body.

When Officer Trentham responded to the scene at the credit union, he believed he was investigating a case involving a pedestrian being struck by a vehicle. Upon arrival, Officer Trentham initially thought that a pedestrian was walking down the sidewalk and was struck by a car entering the parking lot. At that time, he had not yet seen the front of appellant's vehicle. Officer Trentham walked around and surveyed the scene. He noted several drag marks from the edge of the roadway leading toward the final resting spot of the victim and the automobile. He also observed the presence of red drag marks that were consistent with blood. He saw blood drops at the edge of the roadway and blood smear from the sidewalk onto the asphalt area of the parking lot. Officer Trentham found blue drag marks that were consistent with the victim's denim jacket. All of the marks he found started at the edge of the road and led up to the final point of rest of the victim's body and appellant's car. Officer Trentham located a tan or brown scrape mark that was consistent with the victim's skin and the injury pattern the medical examiner found on the victim's lower body. He observed two small black marks that were consistent with the victim's shoes. Again, all of the lines Officer Trentham observed led from the street toward the credit union to the point where the victim's body came to rest. He was able to determine the direction of movement because the marks were darker at the initial points of impact and faded as they moved forward.

Officer Trentham's examination of appellant's vehicle indicated that the dirt around the trunk key had been disturbed. He did not observe any disturbance of dirt around the occupants' sides of the vehicle. He determined that something had disturbed the dirt around the front license plate holder and the lower part of the front bumper. These marks indicated to Officer Trentham that the victim's body was struck from the front as the vehicle moved in a forward direction. He looked under the car with a flashlight and noticed blood on the frame next to the right front wheel. He also saw blue lines that were consistent with the victim's denim jacket. Grease marks and dirt on the victim's jacket were consistent with her clothing coming into contact with the right front wheel area of appellant's car.

As Officer Trentham completed his initial investigation at the crime scene, he observed a cigarette lighter and a clump of hair at the point where he believed that the victim was initially struck at the curb line. He testified that the driver of the wrecker that towed appellant's car to the Knoxville city impound lot did not enter the vehicle or turn the steering wheel. Officer Trentham further insured that no one disturbed any dirt on the body of the vehicle. He followed the car to the impound lot. He had the car taken into the police garage and placed on a rack so that investigators could observe any further evidence. As part of the reconstruction, Officer Trentham measured the vehicle. At the garage, he observed blood running the length of the vehicle on the passenger side leading to the rear passenger side tire. Just before the rear tire, he noticed a pattern of lines consistent with the victim's jacket on the frame of the car next to the rear tire. While at the garage, Officer Trentham transferred the victim's shoes and the clump of hair to Officer Cox.

Officer Trentham found that the marks on the victim's left shoe were significant in that they were consistent with the victim being dragged across the concrete and asphalt. Officers found the shoestring just beside the driver's door of the vehicle as it came to rest. Officer Trentham gave his expert opinion regarding the point of impact between appellant's car and the victim. Based on the evidence and location of the blood, skin, and blue fibers, he gleaned that, from the point where the victim was struck, she was then pushed by the vehicle. The victim's skin was transferred to the pavement as a result of her jogging pants coming down, exposing her hip area to the concrete, and leaving marks. Officer Trentham's opinion was that the victim was lying on the ground bleeding at the curb line and that the point of impact with appellant's automobile was at the curb line.

L.B. Steele was assigned to the motor traffic unit of the Knoxville Police Department and was Officer Trentham's partner. After *voir dire*, the trial court qualified Officer Steele as an expert in accident reconstruction. On the morning of March 5, 2008, Officer Trentham called Officer Steele and asked him to gather their measuring equipment then proceed to the crime scene. When he first arrived, Officer Steele believed he was responding to an accident involving a vehicle striking a pedestrian. In reviewing the evidence, he and Office Trentham

tried to determine how a pedestrian fatality could have occurred because the evidence indicated that the victim had been lying on the ground, or at the very least, was lower to the ground than she was to a standing position. Officer Steele took crime scene measurements with their equipment and loaded the information into the data storage system. He later transferred the data to a computer at the police department and made two discs containing the information. The distance from the first blood drop near the edge of the roadway to the left front tire at its resting position was 34.91 feet.

Special Agent Lisa Wessner was a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI") crime laboratory, assigned to the forensic serology and DNA analysis unit. In the course of this case, she received a DNA sample from the victim, buccal swabs from appellant, and swabs from appellant's vehicle taken from a sway bar guard, metal sheet, right rear tire, front guard and tubing guard. The sample from the sway bar guard failed to indicate the presence of blood; the remainder of the swabs from the vehicle contained blood. DNA obtained from the metal sheet, the front guard, and the tubing guard matched the victim's DNA profile. Agent Wessner could not obtain a DNA profile from the rear tire because the DNA was insufficient or degraded. The probability of the DNA belonging to an individual unrelated to the victim exceeded the current world population.

Officer Scott Noe with the Knoxville Police Department responded to a domestic call made by the victim on November 16, 2006. When he arrived, Officer Noe observed that the victim had a black eye. He transported the victim to the commissioner's office so she could sign a warrant against appellant. In the warrant, the victim alleged that she and appellant argued over bus fare, at which time appellant punched her in the eye. Appellant pled guilty to the charge.

The trial court allowed Dr. Darinka Mileusnic-Polchan to testify as an expert witness in forensics. Dr. Mileusnic-Polchan responded to the crime scene at the credit union, where she observed the victim in a supine, or face-up, position under the rear bumper of appellant's car. After reviewing the scene and taking photographs, Dr. Mileusnic-Polchan performed the autopsy of the victim the same day. She took additional detailed photographs of the victim's clothing. Dr. Mileusnic-Polchan opined that in cases such as this, the existence of conflicting information makes it necessary for her to document the case very carefully, because even the smallest finding on the body can prove important in determining what actually happened. Based on her findings, Dr. Mileusnic-Polchan formed the opinion that the victim's manner of death was a homicide.

In most cases involving a pedestrian accident, Dr. Mileusnic-Polchan would expect to see injuries to the lower extremities, specifically the calves, knees, and sometimes the thighs, of the victim. She did not find those injuries on the victim. She examined the

victim's body and documented every injury. Dr. Mileusnic-Polchan documented sixty separate injuries. The victim suffered several head and neck injuries, including linear marks on the chin consistent with tire marks. An abrasion by the right eyebrow displayed directionality, indicating that the body was moving against the surface. Dr. Mileusnic-Polchan found blood stains and hair attached to the shoulder of victim's jacket, most likely caused by forced bending of the head over the shoulder.

Dr. Mileusnic-Polchan noted that the victim's right clavicle was broken, and the neck and spine junction was fractured. The fracture was caused by extraordinary force that separated the head from the neck. The tire marks on the victim's neck indicated that the vehicle's rear tire ran over it. This injury was one of the primary causes of the victim's death. The victim also had linear abrasions under and on her right breast. Dr. Mileusnic-Polchan described the injury to the victim's breast area as indicating movement of the victim in a particular direction, and attributed the injury to contact with the front bumper of appellant's vehicle. She analyzed a bruise pattern and a burn on the victim's body and matched the injuries to a hot part from underneath the car, perhaps part of the exhaust or catalytic converter.

The victim's abdomen sustained a great deal of injury, including "abrasions and stretch abrasions." Dr. Mileusnic-Polchan identified a tire track along the victim's abdominal abrasions. She stated that the tire marks could only have been made by the front tires because the rear tires were bald and could not have left those particular indentations. Dr. Mileusnic-Polchan pointed out a large burn that was over four inches long by two inches across. The skin from that burn was retrieved from underneath the vehicle. She commented on an extensive deep bruise on the right thigh that could only be consistent with the tire crossing the victim's thigh. The victim's pelvis was completely crushed, including the sacrum.

Dr. Mileusnic-Polchan noted that the victim's back was relatively clear of injury, which indicated that she was facing the vehicle with clothing covering her back. The victim did, however, receive a road rash injury to her back and buttocks. In the sacral area, some of the victim's skin was missing. Dr. Mileusnic-Polchan explained that the pattern of the injury established the direction of movement of the victim's body.

As part of her investigation, Dr. Mileusnic-Polchan examined appellant's vehicle at the impound lot. She compared the victim's injuries with the damage to and evidence on appellant's vehicle. Dr. Mileusnic-Polchan found that the evidence and victim's injuries supported the conclusion that the victim was struck by the front of the vehicle.

Dr. Gregory James Davis testified on behalf of appellant as an expert in the field of forensic pathology. He reviewed all of the evidence collected in the case, together with reports from the medical examiner and TBI. In scrutinizing Dr. Mileusnic-Polchan's testimony, Dr. Davis explained that the term "consistent with" merely implies that physical evidence could support a particular scenario; the term itself does not mean that the scenario or story is true. Dr. Davis explained that while the evidence is consistent with the classification of the victim's death as a homicide, it is also consistent with other classifications.

Based on his review of the evidence, Dr. Davis could not offer an opinion as to whether appellant intended to inflict harm on the victim, nor could he confirm that the victim's injuries were unidirectional. The injuries were consistent with being unidirectional but were not indicative or diagnostic of them being unidirectional. Dr. Davis disputed Dr. Mileusnic-Polchan's finding that the injury on the victim's face was consistent with being run over by the tire of the car. If her face had been run over by a car, he would have expected to find more fractures to the jaw and skull. Dr. Davis believed that the victim's death should have been classified as "undetermined" or "not determined." His view of the physical evidence was that the evidence was consistent with appellant's backing over the victim. The injuries sustained by the victim, specifically the wrist fracture and the abrasions on both hands, were consistent with her walking away from the vehicle, falling, and being struck by appellant's vehicle.

James Alan Parham, a civil engineer with Parham Engineering Consultants, testified on behalf of appellant. Mr. Parham's primary focus was on highway design and transportation safety. The trial court allowed him to testify as an expert in accident reconstruction. In preparing for this case, Mr. Parham reviewed all of the evidence, reports, and photographs. He also visited the scene of the incident on more than one occasion and examined appellant's automobile. Mr. Parham generally agreed with many of Officers Trentham's and Steele's findings. However, Mr. Parham opined that the absence of black scrape marks and scuffs going toward Magnolia Avenue does not rule out the possibility that the victim's body was dragged in that direction. Because of the downhill slope of the parking lot, a body would not offer much resistance to being pushed. Also, the asphalt would offer less friction force on a body than would the sidewalk.

Although Mr. Parham agreed that the victim was not standing at the time of impact, he disagreed with the officers' findings that the victim was pushed by appellant's automobile and dragged until her body was dislodged under the right rear tire. He stated that the police department did not sufficiently document the vehicle in order for him to determine the presence of dirt rub on the trunk, hood, or bumpers of appellant's vehicle. Mr. Parham did not find the photograph of the front license plate to be conclusive of dirt rub or interaction

with a person. He did not find dirt rub documented anywhere on the topside of the vehicle but found dirt rub underneath the vehicle itself. Mr. Parham identified dirt rub on the undercarriage of appellant's automobile. He did not believe that the officers' opinions that the victim was struck in one direction could be proven by the evidence.

Mr. Parham testified that his examination of appellant's car was limited because the car had been stored outdoors exposed to weather. He disagreed with Officer Steele about the importance of storing the vehicle under cover, stating that in a low-impact case the data is very fragile. Mr. Parham believed that one rain incident could compromise the evidentiary value of the car.

Mr. Parham placed great value on the location of the victim's broken shoelace. In his opinion, the shoelace was broken due to a forceful break, such as a tire pinning the shoelace to the ground as the body is being dragged. The location of the shoelace indicated to him that the victim's body had to be at the point where the shoelace was recovered when it was struck. The shoelace would not have held such value to him if it were located closer to Magnolia Avenue or if the body was located beyond the shoelace. Based on the evidence and appellant's theory of the incident, Mr. Parham offered the opinion that the physical evidence was consistent with appellant's explanation of the incident.

After deliberating, the jury found appellant guilty of second degree murder as a lesser-included offense of first degree murder.

## C. Facts from Sentencing

The victim's daughter, Lachrisa Clemmons, and the victim's son, Leon Boulanger, offered victim impact evidence. Each of them testified regarding verbal and physical abuse that the victim suffered at the hands of appellant. Virginia Thompson, the victim's mother, testified that the victim had been a happy child and that as an adult, she was uplifting to other people. The victim was an optimistic and religious woman who prayed regularly for her husband and others. At some point, appellant became withdrawn at family functions. Ms. Thompson also witnessed a decline in the victim's general disposition. She confronted appellant once and advised him to pray about his problems instead of hitting the victim, but he laughed at her.

Gail Carter met the Cornwells when she worked next door to where they both were previously employed. Appellant and the victim were not married at the time. The victim was slow to open up to Ms. Carter about personal issues. The victim's co-workers, however, called Ms. Carter on several occasions and reported that appellant struck the victim in their presence. On one occasion, appellant dragged the victim through the parking lot by her hair.

Several weeks later, Ms. Carter observed that the victim's toes were broken. She denied that appellant inflicted the injuries. On a separate occasion, appellant was beating the victim when she ran to Ms. Carter's office. Ms. Carter locked the door. Although the victim did not want Ms. Carter to call the police, she did so. The victim suffered two black eyes but did not want to press charges against appellant.

Ms. Carter worked in the office of a marriage counselor. When the victim told Ms. Carter that she wanted to marry appellant, Ms. Carter advised her to consider the decision carefully but that she would ultimately support her decision. Ms. Carter attended the wedding. Sometime after appellant and the victim were married, the victim wanted to visit her mother in North Carolina. The victim's car was not working, so Ms. Carter allowed the victim to borrow her car with the understanding that appellant was not to drive the car because he did not have a valid license. After the victim returned, appellant would not return Ms. Carter's car. He told her he wanted to buy it. Ms. Carter said she would sell it, but appellant said he would have to make payments. When Ms. Carter declined, she asked him for the keys and appellant refused. She obtained a spare set of keys from her desk and drove her car home.

Appellant testified at the sentencing hearing. He met the victim in North Carolina. Appellant had been dealing drugs, and both he and the victim used drugs. He decided that North Carolina was not a healthy place for him to live, and appellant talked to the victim about leaving her family and moving to Knoxville. Upon relocating to Knoxville, appellant and the victim stayed with friends. They both found jobs at the Marriott and moved into an apartment. They stayed mostly drug-free, except for one mistake he made. In 2006, appellant and the victim had an argument and he hit her. She filed charges and had him arrested. The victim went to be with her family in North Carolina but later returned and posted appellant's bond. Appellant stated that he promised the victim that he would never hurt her again. After that, he went to anger management classes and they attended a Bible study together. Appellant maintained that he kept his promise to the victim and never struck her again.

Appellant had a history of violence against women. He assaulted Africa Williams in 1990 and 1991. In 1992 and 1993, he assaulted Tina McBride. Although he began anger management classes after pleading guilty to the charge involving the victim, he never completed the classes.

After hearing testimony and receiving evidence, the court sentenced appellant as a Range II offender to thirty-five years in prison. Following the trial court's denial of his motion for new trial, appellant timely filed this notice of appeal.

## II.  Analysis

### A.  Alleged *Ferguson* Violation

Prior to trial, appellant filed a motion to dismiss the indictment pursuant to our supreme court's *Ferguson* decision. *See generally Ferguson*, 2 S.W.3d at 915-17. Appellant contended that while under the State's control, his vehicle lost exculpatory evidentiary value because the State allowed the vehicle to remain outdoors, unprotected, and exposed to the elements.  The importance of the evidence, according to appellant, was that valuable dirt rub evidence would have been visible at the point of contact on the automobile where it struck the victim.  While the State's experts testified that they observed dirt rub on the front license plate of the car and took photographs of the dirt rub, appellant argues that the photographs did not clearly reflect their observation.  Moreover, appellant emphasized the alleged prejudice inherent in his experts being denied the opportunity to examine both the front and the rear areas of the automobile to determine if dirt rub was present in either area.

In *Ferguson*, our supreme court considered the appropriate "consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory."  *Ferguson*, 2 S.W.3d at 914.  Our supreme court exercised its authority to "expand the minimum level of protection mandated by the federal constitution," *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992), by rejecting the United States Supreme Court's "bad faith" standard in favor of a test that is less onerous on a criminal defendant. *Ferguson*, 2 S.W.3d at 916.  *See generally Arizona v. Youngblood*, 488 U.S. 51 (1988).  The court, instead,"'promulgate[d] . . . an analysis in which the critical inquiry is: Whether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair?'" *State v. Coulter*, 67 S.W.3d 3, 54 (Tenn. Crim. App. 2001) (quoting *Ferguson*, 2 S.W.3d at 914).  In *Coulter*, this court reiterated the State's general duty to preserve all evidence to allow a criminal defendant the opportunity for discovery and inspection, but noted that for the purpose of determining "fundamental fairness," our supreme court "seemingly cited with approval" the following standard enunciated in *California v. Trombetta*, 467 U.S. 479, 488-89 (1984):

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

-16-

*Coulter*, 67 S.W.3d at 54 (quoting *Ferguson*, 2 S.W.3d at 917).[2]  Only if the proof demonstrates that the State had a duty to preserve the evidence and that the State failed in that duty, the analysis then shifts to a consideration of the following factors in deciding the consequences of the State's breach:

(1)     The degree of negligence involved;

(2)     The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3)     The sufficiency of the other evidence used at trial to support the conviction.

*Id.* (quoting *Ferguson*, 2 S.W.3d at 917).  If, after due consideration of the three factors, the trial court concludes that a trial without the missing or destroyed evidence would not be fundamentally fair, the court may order dismissal of the charges. *Ferguson*, 2 S.W.2d at 917. "Dismissal is, however, but one of the trial judge's options." *Id.* The trial court may craft a special jury instruction or grant other appropriate remedies. *Id.*

On appeal, appellant argues that the trial court should have dismissed the indictment against him or granted "other appropriate relief," including prohibiting the State's witnesses from testifying about the presence or absence of dirt rub evidence. Notably, at trial, appellant asked only for the remedy of dismissal of the indictment. Appellant did not request a special jury instruction and did not ask the court to limit the testimony of the State's witnesses. Nor did he claim the trial court's failure to do so was error at the hearing on the motion for a new trial. Appellant is bound by the ground he asserted when making his *Ferguson* argument in the trial court. *See State v. Adkisson*, 899 S.W.2d 626, 634-35  (Tenn. Crim. App. 1994). He cannot assert a novel theory or request different relief on appeal. *Id.* at 635.  Inasmuch as appellant failed to request relief other than dismissal, he has waived his right to other such relief. *See State v. Randy Ray McFarlin, a/k/a Mac Ray McFarlane,* No. M2010-00853-CCA-R3-CD, 2012 WL 76902, at *9 (Tenn. Crim. App. Jan. 9, 2012) (holding that, "[t]o the extent that the defendant may have claimed relief via *Ferguson* in any manner that would

---

[2] Our court recently discussed this issue and pointed out that panels of this court have determined that evidence should have been preserved without first finding that its exculpatory value was apparent. *State v. Jerome Sidney Barrett,* No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *21 (Tenn. Crim. App. July 18, 2012), *perm. app. granted*, No. M2010-00444-SC-R11-CD (Tenn. Sept. 17, 2012). The Barrett court criticized the *Coulter* court's analysis of *Ferguson*; however, because *Coulter* is a published opinion, the Barrett court was bound to follow it. *Id.* at *22.

merely result in the grant of a new trial [rather than dismissal of the indictment], this issue is waived"), *perm. app. denied* (Tenn. May 21, 2012).

Appellant contests the State's allowing dirt rub and other physical evidence to degrade from the vehicle while it sat unprotected in the elements. In analyzing the issue of fundamental fairness, we note that officers observed the dirt rub evidence on the front of the car. The location of the dirt rub was *inculpatory*, not exculpatory. Appellant does not contend that further examination would have revealed dirt rub on the rear of the vehicle, which would have been exculpatory in nature. He merely asserts that he suffered prejudice because his experts could not independently examine the vehicle. However, law enforcement officers testified about the lack of dirt rub evidence on the rear portion of appellant's automobile. When "the chances [were] extremely low that preserved samples would have been exculpatory," the Due Process Clause of the Fourteenth Amendment does not require law enforcement agencies to preserve evidence for later use. *Trombetta*, 467 U.S. at 488-491. Moreover, "[t]he possibility that . . . [evidence] could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*." *Youngblood*, 488 U.S. at 56 n.1.

Furthermore, the evidence was available at trial through comparable means. The State's witnesses, including two accident reconstructionists, an evidence technician, and the medical examiner, each testified that he or she observed what appeared to be dirt rub on the front license plate of the car and did not observe such evidence on the rear portion of the automobile. They collectively documented blood spatter and other evidence on the front portion of the undercarriage, which was consistent with the State's theory of the case that appellant struck the victim while traveling in a forward motion. All of the aforementioned evidence was provided to appellant before the trial. In light of the officers' initial findings, all of which tended to inculpate appellant, any potentially exculpatory evidence was not apparent to agents of the State. For these reasons, we conclude that the vehicle itself did not possess sufficient evidentiary value to rise to the level of "constitutional materiality." *Youngblood*, 488 U.S. at 56 n.1.

Even if this court found the evidence to be material, analysis of the three *Ferguson* factors would result in no relief. Addressing first the degree of negligence involved, *Ferguson*, 2 S.W.3d at 917, we cannot conclude from our review of the record that the State acted negligently. Law enforcement officers carefully documented all evidentiary aspects of appellant's vehicle by photographing dirt rub patterns, photographing the undercarriage of the vehicle, and obtaining DNA swabs from various points on the vehicle. The only complaint appellant has with the State's collection of evidence is that the photograph of the front bumper does not, in his opinion, reflect the presence of dirt rub. To the extent that appellant argues there was no dirt rub evidence on the front of the vehicle, the jury received

photographs of the dirt rub. The jury, as the trier of fact, reviewed the photographs and determined for itself whether dirt rub was visible in the photographs. In light of the photographic evidence and DNA testing, all of which was probative and reliable, the ability to observe the actual dirt remaining on the vehicle months later was insignificant. *See id.*

The second prong of the initial inquiry focuses on whether the lost or destroyed evidence is of such a nature that appellant would be "unable to obtain comparable evidence by other reasonably available means." *Ferguson*, 2 S.W.2d at 917. The State thoroughly photographed appellant's vehicle from all angles, including photographs taken of the undercarriage. Our preceding discussion outlines the procedures utilized by the State in preserving evidence. Appellant obtained "comparable" evidence through photographic preservation of the evidence.

Finally, we conclude that the jury had sufficient evidence by which to sustain appellant's conviction, including but not limited to: (1) testimony regarding motive; (2) DNA testing confirming the victim's blood on the undercarriage of the vehicle; (3) blood spatter evidence indicating directionality of the vehicle and the victim's body; (4) medical testimony regarding the identification of wound patterns and the mechanisms or parts of the vehicle that caused them, and (5) photographs of the front of the vehicle license plate holder where officers observed dirt rub evidence. *See id.*

For the foregoing reasons, "to conclude that the [vehicle] possessed exculpatory value on the basis of the record before this court would constitute an exercise in pure speculation." *Coulter*, 67 S.W.3d at 54-55. The State did not have a duty to preserve the evidentiary value of the exterior of appellant's automobile, and even if it did, appellant's trial was not rendered fundamentally unfair without this evidence. Therefore, appellant is not entitled to relief on this issue.

## B. Expert Testimony

### 1. Standard of Review

Appellant contests the expert testimony of three of the State's witnesses, medical examiner Dr. Mileusnic-Polchan, and accident reconstructionists L.B. Steele and Ron Trentham.

We begin our analysis with the proposition that admissibility of expert testimony is governed by the Tennessee Rules of Evidence:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott,* 275 S.W.3d 395, 401-02 (Tenn. 2009) (*internal citations and quotations omitted*). The supreme court further noted:

There are certain methods and foundations that, as a matter of law, are established for purposes of admissibility as being reliable or unreliable either by statute or by having already been assessed for their reliability in a prior controlling judicial decision. There are also "ordinary cases" where methodological and foundational reliability may be simply assumed in the absence of some sufficiently weighty showing by the objecting party that warrants a more in-depth inquiry. However, other cases will require trial courts to make a more probing inquiry.

*Scott*, 275 S.W.3d at 403.

The trial court is vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott,* 275 S.W.3d at 404; *see Stevens*, 78 S.W.3d at 832. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining

-20-

party.  *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

## 2.  Dr. Darinka Mileusnic-Polchan's Testimony

Appellant filed a pre-trial motion requesting disclosure of the opinions to be proffered by Dr. Mileusnic-Polchan as well as a hearing to determine the admissibility of her opinions. Following an evidentiary hearing, the trial court determined that her opinions were admissible.  At trial, the State tendered Dr. Mileusnic-Polchan as an expert in the field of forensic pathology.  The court held a jury-out *McDaniel* hearing to ascertain the reliability of her testimony. Dr. Mileusnic-Polchan is a board-certified forensic pathologist.  She based her opinions on her personal observations at the crime scene; the evidence, including her examination of the vehicle; reports; witness statements; a professional treatise; and the autopsy she conducted.  Dr. Mileusnic-Polchan had been accepted as an expert witness in other cases and permitted to testify in court.  Following the hearing, the trial court ruled that Dr. Mileusnic-Polchan could testify due to her expertise in the field of forensic pathology. Appellant did not object to Dr. Mileusnic-Polchan's being qualified as an expert by the court.

We first note that in the sixty-six pages of the State's direct examination of the witness, appellant lodged four objections, one to the form of a question.  He objected to the following three opinions: 1) that the front of appellant's vehicle had an imprint of the denim jacket victim was wearing when she was struck; 2) that the injury to the victim's chest was caused by the front license plate holder of appellant's car; and 3) that there was a part on the underneath side of the automobile that resembled a cheese grater and that the wound pattern on the victim  indicated forward movement of the car because of the skin was stretched and not cut.

We must agree with appellant that Dr. Mileusnic-Polchan's testimony regarding the denim jacket leaving an imprint on the front of appellant's vehicle was not a proper subject for expert testimony by a forensic pathologist.  We are inclined to view this as an expert's offering an opinion on a matter that would not substantially assist the trier of fact.  The State admitted several photographs of all angles of appellant's automobile.  A lay witness could make the comparison as easily as an expert witness.  Any error in this regard, however, is harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

Appellant's remaining two objections involve Dr. Mileusnic-Polchan's testimony about the manner of infliction of a wound or injury.  We conclude that this is a proper subject

upon which a medical examiner may offer testimony. To the extent that appellant argues herein that said opinions constituted Dr. Mileusnic-Polchan's testifying outside of her area of expertise, we conclude otherwise. Her testimony did not involve accident reconstruction or engineering, as appellant advances. Rather, she testified about the interaction between the automobile and the victim's body.

On appeal, appellant raises new challenges to the testimony of Dr. Mileusnic-Polchan on two bases: 1) that Dr. Mileusnic-Polchan was biased in favor of the State; and 2) that Dr. Mileusnic-Polchan testified outside of her area of expertise by testifying with regard to blood spatter. Although appellant failed to contemporaneously object to the testimony on these grounds, he raised the issue in his motion for new trial and on appeal. This court has held waiver to be appropriate in such circumstances. *See State v. Robert Lee Mallard*, No. M1999-00336-CCA-R3-CD, 1999 WL 1209523, at *1 (Tenn. Crim. App. Dec. 17, 1999).

While plain error review is available to this court as a tool by which to review appellant's new challenges, he does not request plain error review of this issue, and we do not discern a basis for such under the facts of this case. *State v. Gary Thomas Reed*, No. E2009-02238-CCA-R3-CD, 2011 WL 1842711, at *5 (Tenn. Crim. App. May 12, 2011), *perm. app. denied* (Tenn. Aug. 24, 2011); *see* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, this court has previously held that a forensic pathologist may offer testimony regarding blood spatter analysis. *State v. Wayne Robert Wait*, No. E2010-01212-CCA-R3-CD, 2011 WL 5137178, at *9 (Tenn. Crim. App. Oct. 28, 2011) (holding that blood spatter testimony is within the purview of a forensic pathologist). We further find no error in the expert's opinion that the manner of death was homicide. *See, e.g., State v. Ayers*, 200 S.W.3d 618, 623 (Tenn. Crim. App. 2005) (holding that when the foundation of an expert's opinion is reliable, expert can testify that manner of death was homicide). *But see State v. Ward*, 138 S.W.3d 245, 268 (Tenn. Crim. App. 2003) (disallowing expert testimony that manner of death was homicide when foundation of opinion involved the unreliable "rule of three" attributing homicide as cause of death when victim is the third child under care of a single caretaker to suffer an undetermined cause of death). Appellant is not entitled to relief on this issue.

### 3. Officers L.B. Steele and Ron Trentham

Appellant next argues that the trial court improperly qualified Officers L. B. Steele and Ron Trentham as experts in the field of accident reconstruction. Appellant filed a pre-trial motion to obtain the credentials of both witnesses and the opinions to be rendered by each of them at trial. During a pre-trial motion hearing, appellant contested the qualifications

of Joe Cox and L.B. Steele to testify as experts. He did not address Officer Ron Trentham as a possible expert witness. The State and appellant agreed that the field of accident reconstruction is a generally accepted scientific field and is appropriate for expert testimony. The State disclosed the officers' reports to appellant in advance of trial. Although the trial court did not hold a pre-trial hearing to ascertain the witnesses' qualifications and credentials, the court permitted appellant to ask questions on *voir dire* before it accepted the witnesses as experts.

### a. Qualifications of Officer Ron Trentham

Following his *voir dire* of Officer Trentham, appellant lodged no objection to the court's accepting him as an expert witness. In light of appellant's failure to object to the trial court's ruling allowing Officer Trentham to testify as an expert in the field of accident reconstruction, this issue is waived. Again, while plain error review is available to this court as a tool by which to review appellant's new challenges, he does not request plain error review of this issue, and we do not discern a basis for such under these particular facts. *Gary Thomas Reed*, 2011 WL 1842711, at *5. Appellant is not entitled to relief on this issue.

### b. Qualifications of Officer L. B. Steele

Following his *voir dire* of L. B. Steele, appellant lodged an objection to the court's accepting Officer Steele as an expert witness. In ruling on the objection, the court stated that the witness would likely testify about documentation and measurements. Appellant rescinded his objection to the witness's testimony if it were limited in scope as the court expected. The court reserved ruling on appellant's objection in the likelihood that Officer Steele offered objectionable expert opinions.

As the trial court anticipated, Officer Steele's testimony was factual in nature. He did not offer any "expert" opinions regarding his synthesis of the evidence. Officer Steele's testimony indicated that he obtained measurements at the crime scene, loaded the information into the data storage system, transferred the data to a computer at the police department, and then made two discs containing the information. Appellant must not have found Officer Steele's testimony objectionable, as he did not renew his objection or ask the trial court for a ruling on the issue. For these reasons, we find that appellant waived his complaint for our review and decline to employ a plain error analysis. *See Gary Thomas Reed*, 2011 WL 1842711, at *5.

c. Substance of Accident Reconstructionists' Testimony

In his brief, appellant contests the accident reconstructionists' testimony as demonstrating "a lack of expertise" in failing to adequately photograph the vehicle, failing to protect the automobile from the elements, and failing to account for the slope of the driveway at the credit union. The State responds that the experts' opinions that are disagreeable to appellant do not render them unqualified to offer said testimony. We agree.

Appellant presented his own accident reconstructionist as an expert to rebut and refute many of the State's experts contentions and opinions. His expert addressed the points of the State's experts testimony of which appellant complains on appeal. "'[T]he jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case.'" *Dellinger*, 279 S.W.3d at 292 (quoting *Sparks*, 891 S.W.2d at 616). "'[T]he weight to be given [expert testimony] is a question for the jury under careful instruction of the trial judge.'" *State v. Ayers*, 200 S.W.3d 618, 223 (Tenn. Crim. App. 2005) (*quoting Mullendore v. State*, 191 S.W.2d 149, 152 (1945)). Accrediting the verdict of a properly instructed jury, we discern no error with respect to the qualifications of the expert witnesses or the opinions they rendered at trial.

C. Trial Testimony of Anthony Anderson and Stephanie Anderson

Appellant raises two issues pertaining to the trial testimony of Anthony Anderson and Stephanie Anderson. He first contends that the State suppressed evidence, namely audiotape recordings of interviews with the witnesses, and that the trial court erred in allowing the State to present their testimony at trial.

1. Alleged *Brady* Violation

Appellant argues that the State violated the tenets of *Brady v. Maryland,* 373 U.S. 83 (1963), by withholding exculpatory or impeaching evidence until two days prior to trial. The evidence in question consists of audiotapes of interviews with Anthony Anderson and Stephanie Anderson. The State's *Brady* violation was further compounded, asserts appellant, by the trial court's allowing the witnesses to testify despite the State's alleged error.

In interpreting its holding in *Brady*, the United States Supreme Court succinctly stated:

> There are three components of a true *Brady* violation: The evidence at issue
> must be favorable to the accused, either because it is exculpatory, or because

it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Although the inconsistencies among Mr. Anderson's statements to law enforcement, his testimony at the preliminary hearing, and his trial testimony are minute, the audiotapes were arguably favorable to appellant in that they could have been used to impeach Mr. Anderson's trial testimony.

However, the second and third components of the *Strickler* standard are not established by the facts of this case. This court has previously addressed the difference between delayed disclosure of evidence and absolute non-disclosure of evidence:

Indeed, when there has been a delayed disclosure of evidence, as opposed to a complete non-disclosure, *Brady* is normally inapplicable unless the delay itself causes prejudice. When there has been a delayed disclosure, as opposed to a non-disclosure, the appellant must establish that the delayed disclosure prevented him from using the disclosed material effectively in preparing and presenting his case.

The petitioner has failed to show how, or even allege, the delay in receiving the materials . . . prejudiced his case.

*Norris E. Ray v. State*, No. W2010-01675-CCA-R3-PC, 2011 WL 5996037, at *18 (Tenn. Crim. App. Nov. 30, 2011) (*internal citations omitted*), *perm. app. denied* (Tenn. Apr. 24, 2012). Our holding in *Norris E. Ray* is dispositive of this issue. Appellant has neither alleged nor proven that the delay in the State's production of the audiotapes prejudiced his case in any way. Our case law has not expanded the meaning of "suppression" for the purposes of a *Brady* violation to include late disclosure wherein appellant suffered no prejudice. As such, appellant has not demonstrated a "true *Brady*" violation. *Strickler*, 527 U.S. at 281-82. The trial court properly permitted the witnesses to testify.

2. Tennessee Rule of Evidence 404(b)

The State proffered the testimony of appellant's neighbors Anthony and Stephanie Anderson. Pursuant to appellant's objection, the trial court held a 404(b) hearing to determine the admissibility of their testimony. Tenn. R. Evid. 404(b).

Rule 404(b) provides:

Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1)     The court upon request must hold a hearing outside the jury's presence;

(2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3)     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Possible "other purposes" for which evidence of other crimes, wrongs or acts may be admitted include identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b), Advisory Comm'n Commt.

Thus, to satisfy the requirement of relevancy, the first inquiry by the trial court must be whether "'a material issue exists other than conduct conforming with a character trait.'" *State v. Cary*, 922 S.W.2d 511, 514 (Tenn. 1996) (quoting *State v. Rickman*, 876 S.W.2d 824, 829 (Tenn.1994)). Upon the court's satisfaction of the existence of a material issue, the trial court must then weigh the proffered evidence to determine whether the probative value outweighs the danger of unfair prejudice to the defendant. *Cary*, 922 S.W.2d at 514 (citing *Rickman*, 876 S.W.2d at 829). The trial court must finally find that appellant committed the other crimes, wrongs, or acts by clear and convincing evidence. *Id.* (citations omitted).

When it substantially complies with the procedural requirements of Rule 404(b), the trial court's determination of admissibility is entitled to deference on appeal. *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. 2008); *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). In reviewing a trial court's ruling on 404(b) evidence, an appellate court may not disturb the lower court's ruling absent an abuse of discretion. *Gilley*, 297 S.W.3d at 758; *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005).

The substance of Anthony Anderson's testimony was that he heard appellant yell obscenities at his wife and threaten to kill her. Stephanie Anderson's testimony recounted her overhearing appellant's argument with the victim and his calling the victim profane names. Following the jury-out proffers, the trial court determined that their testimony was relevant to the material issue of appellant's intent and motive. The trial court found that the probative value of the evidence outweighed the potential for unfair prejudice. Finally, the court found by clear and convincing evidence that appellant committed the acts to which the Andersons testified.

Over the State's objection, the trial court disallowed testimony by Mrs. Anderson that she heard victim tell appellant, "Carlos, you would be that stupid to kill me and sit in the jail cell the rest of your life? You're stupider than what I think you are." Clearly the trial court followed the procedural mandates of 404(b) and Tennessee case law in ascertaining the admissibility of the proffered testimony and erred on the side of caution in disallowing questionable evidence. In light of the trial court's substantial compliance with the procedural requirements, we defer to the trial court's ruling. The trial court did not abuse its discretion in admitting the testimony of Anthony and Stephanie Anderson.

### 3. Failure to Declare a Mistrial

Although the trial court disallowed Mrs. Anderson from testifying that she heard the victim state, "Carlos, you would be that stupid to kill me and sit in the jail cell the rest of your life? You're stupider than what I think you are," the court did not issue said ruling until trial was well underway. The prosecutor had already used the comment in her opening statement. Her remarks to the jury did not elicit an objection from appellant. During trial, upon receiving the trial court's ruling excluding this testimony, appellant moved for a mistrial. *See State v. J.C. Fair and Krederick Fair,* No. W2007-00730-CCA-R3-CD, 2009 WL 2501991, at *15 (Tenn. Crim. App. Aug. 14, 2009) (holding that "[d]espite the absence of a contemporaneous objection, [appellant] did move for a mistrial"), *perm. app. denied* (Tenn. Feb. 22, 2010). Thus, appellant preserved this issue for our review.

A trial court may declare a mistrial if it appears that some matter has occurred which would prevent the jury from reaching an impartial verdict. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A trial court should only declare a mistrial in criminal cases where a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is appropriate "when a trial cannot continue or a miscarriage of justice would result if it did." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). This court will review the trial court's decision to grant or deny a mistrial for abuse of discretion. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). The party requesting the mistrial

bears the burden of establishing the necessity for it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In ruling on appellant's motion for a mistrial, the trial court stated:

This is a–this is an insignificant–in the overall scheme of this trial and the evidence that's come into this trial, this is insignificant. . . . We've got all kinds of physical proof. We've got all kinds of eyewitness testimony. We've got the statement of the defendant. We've got expert proof . . .whether or not that–those eight words were spoken or not spoken is not going to make a difference in this trial, period.

Clearly, in light of the evidence the State had developed up to that point of the trial, the court did not believe that the prosecutor's statement during her opening remarks would result in a miscarriage of justice.

Our 2008 decision in *State v. Willie R. Dyer* is instructive on this issue. *State v. Willie R. Dyer*, No. M2007-02397-CCA-R3-CD, 2008 WL 4949266 (Tenn. Crim. App. Nov. 19, 2008), *perm. app. denied* (Tenn. April 27, 2009). In *Dyer*, appellee[3] lodged a pre-trial objection to the introduction of blood alcohol concentration levels, claiming a problem with the chain of custody. *Willie R. Dyer*, at *1. The trial court denied the motion at that time but warned the State that if it mentioned the blood alcohol concentration level in its opening and the court later deemed the evidence inadmissible, the court would order a mistrial with prejudice. *Id.* Despite the trial court's admonition, the State nonetheless mentioned the blood alcohol concentration level in its opening statement. *Id.* During trial, the court conducted a jury-out hearing regarding the evidence. *Id.* at *2. After hearing testimony at trial from officers and agents from TBI, the trial court excluded the evidence. *Id.* The trial court ultimately ordered a mistrial.

On appeal, after holding that the trial court erred in its exclusion of the blood concentration evidence, this court then considered whether the trial court's granting of a mistrial was appropriate. *Id.* at *6. Applying the "manifest necessity" standard, we held:

We agree with the State that there was no manifest necessity for a mistrial. Having excluded from evidence the results of Appellee's blood alcohol test, the trial court could have instructed the jury that the opening statement of the

_____

[3] The procedural history of the *Dyer* case is that defendant Dyer moved for a mistrial, which the trial court granted. The State appealed, thus, for our discussion of the case, the State is appellant and the defendant is appellee.

prosecutor is not evidence and that the panel should not consider the reference
to the test results as such. This is typically the manner in which references in
opening statements to evidence that is later excluded is handled.

*Id.* at *6.

We agree with the rationale employed by the *Willie R. Dyer* court. Although appellant
did not request a special curative instruction, the trial court charged the jury, "The statements,
arguments, and remarks of the attorneys are intended to help you in understanding and
applying the law, but they are not evidence. You should disregard any statements made that
you believe are not supported by the evidence." Jurors are presumed to follow the
instructions given to them by the trial court. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn.
1994). It is noteworthy that in the instant case, the State was not forewarned of the
possibility of mistrial if it mentioned evidence in its opening statement that the court later
found to be inadmissible. Following our precedent in *Willie R. Dyer*, we hold that the trial
court did not abuse its discretion in denying appellant's motion for a mistrial.

### D. Domestic Violence Affidavit of Complaint

The court held a jury-out hearing to discuss the admissibility of evidence of the
victim's prior injuries. The parties raised three separate instances: 1) the victim's daughter
returned home from a trip and observed her mother with fourteen stitches on her face and two
broken toes but did not have personal knowledge about how the victim received the injuries;
2) the victim sustained an injury to her arm at the hands of appellant but reported to the
hospital that she injured her arm at work and no one could connect appellant with the injury;
and 3) the victim signed an affidavit for a warrant accusing appellant of domestic violence,
to which appellant pled guilty.

Questions regarding the admissibility of evidence rest within the sound discretion of
the trial court, and this court will not disturb the trial court's ruling absent of a clear showing
of abuse. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A trial court abuses its
discretion when it applies an incorrect legal standard or reaches an illogical or unreasonable
conclusion that causes an injustice to the complaining party. *Ruiz*, 204 S.W.3d at 778 (citing
*Howell*, 185 S.W.3d at 337).

In discussing the evidentiary issues pertaining to the victim's various injuries,
appellant argued to the court that if it were to conduct a 404(b) analysis of the first two
instances, the evidence would be deemed highly prejudicial. Tenn. R. Evid. 404(b). Without
necessity of a hearing, the trial court excluded the first two allegations of injuries. The court,
however, ruled that the State would be allowed to introduce evidence of the domestic

violence warrant because appellant pled guilty to it. By entering a guilty plea, appellant admitted the allegations, thus transforming the allegations into an admission.

Appellant did not request a 404(b) hearing on the admissibility of the warrant. In fact, appellant agreed that the warrant was admissible at trial. The State introduced the warrant through the testimony of the responding officer, Scott Noe. Officer Noe testified with regard to receiving the call, interviewing the victim, and observing her injuries. He then read the summary aloud to the jury. Appellant's complaint on appeal is that the court erred by allowing the police officer to read the narrative segment of the affidavit to the jury, to which appellant contemporaneously objected at trial. In his brief, appellant asks this court to employ a 404(b) analysis with regard to the officer's reading of the affidavit, not to the court's admission into evidence of the warrant itself.

We first note that because appellant failed to request a 404(b) jury-out hearing when the officer first began to read the warrant aloud, appellant has waived his right to appellate review of this issue. *State v. Undray Luellen*, No. W2009-02327-CCA-R3-CD, 2011 WL 2557010, at *5 (Tenn. Crim. App. June 27, 2011), *perm. app. denied* (Tenn. Oct. 18, 2011). Moreover, we fail to discern how application of Rule 404(b) would have precluded the reading of the warrant at trial or would entitle appellant to relief in this court. Appellant did not object to the State's introduction of the domestic violence warrant. The warrant itself was entered into evidence through Officer Noe. The warrant was not redacted in any form, nor did appellant request redaction. It is axiomatic that the jury would receive the warrant and have the opportunity during deliberations to read the content thereof. Appellant's attempt to make the comparison between the jury's opportunity to read the warrant and the jury hearing the language of the warrant from the officer results in a distinction with no practical difference. The trial court did not abuse its discretion in allowing the police officer to read a segment of the warrant that would soon be in the jury's hands.

E. State's Closing Argument

In its closing argument, the State advanced its theory of the case by arguing to the jury that appellant punched the victim in the face and knocked her to the ground before running over her with his vehicle. Appellant claims error, stating that there was no evidence to support the State's theory and that the argument constituted "inflammatory speculation."

Our supreme court has aptly noted that "[c]losing arguments in criminal cases have a 'rough and tumble quality' about them." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (quoting *State v. Skakel*, 888 A.2d 985, 1060-61 (2006)). The court further held:

A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice. When called upon to review the propriety of a prosecutor's closing argument, the court should consider: (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

Trial courts have significant discretion to control closing arguments. Ordinarily, counsel must object contemporaneously to a perceived improper argument. However, when flagrantly improper arguments are made, the trial court, with or without objection, should step in and take proper curative action. Some arguments may be so exceptionally flagrant that they constitute plain error and provide grounds for reversal even if they were not objected to.

*Banks*, 271 S.W.3d at 131-32 (*internal citations and quotations omitted*). While we would ordinarily employ an abuse of discretion standard of review in determining whether the trial court allowed the prosecutor too much latitude during closing argument, appellant acknowledges that he failed to contemporaneously object to the comment by the prosecutor. *State v. Hall*, 976 S.W.2d 121, 157 (Tenn. 1998) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Our analysis is thus limited to a review for plain error.

Closing arguments that do not elicit an objection warrant reversal only in exceptional circumstances. *Banks*, 271 S.W.3d at 132 n. 30 (citing *United States v. Smith*, 508 F.3d 861, 864 (8th Cir. 2007)). We adhere to the principle that "'fleeting comments that passed without objection during . . . closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers.'" *Id.* (quoting *United States v. Mullins*, 446 F.3d 750, 758 (8th Cir. 2006)).

This court has previously analyzed a prosecutor's closing argument under the "plain error" standard of review. *State v. Gann*, 251 S.W.3d 446, 462 (Tenn. Crim. App. 2007). This court characterized the State's closing as an "argument on the defendant's character, the brutal nature of the crime, and the strategy of the defense" and opined that the statements "were improper, inflammatory, and utterly indefensible as they violate nearly every rule established for proper closing argument." *Gann*, 251 S.W.3d at 462. We found that the prosecutor's comments were intentional, in light of having been previously cautioned by the

supreme court to "temper" his closing arguments. *Id.* The State's comments were so egregious that this court stated it would have reversed appellant's convictions had counsel objected appropriately. *Id.*

Even so, in *Gann* this court was not convinced that "a substantial right of the accused was adversely affected" or that "consideration of the issue is necessary to do substantial justice. *Id.* We also noted that the standard contained in Tennessee Rule of Criminal Procedure 52, "error that affects substantial rights" has been construed as "error with a prejudicial effect on the outcome of a judicial proceeding." *Id.* at 462-63 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)).

Appellant acknowledges that he did not contemporaneously object to the State's closing argument but insists that "[n]evertheless, trial courts have a duty to restrict any improper argument." Appellant fails to address, much less establish, the factors supporting a finding of plain error. We decline to infer that appellant is invoking this court's authority to conduct a plain error review, nor do we discern a basis for such under the facts of this case. *Gary Thomas Reed*, 2011 WL 1842711, at *5; *see* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Appellant is not entitled to relief on this issue.

## F. Sentencing Issues

Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure states that an appellant's brief shall contain the following with respect to an argument:

(A)    the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B)    for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(a)(7)(A)-(B). Moreover, Rule 10(b) of the Rules of the Court of Criminal Appeals reads, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court." Appellant's raises two arguments pertaining to sentencing errors. While appellant cites to the record, neither argument contains a statement of the applicable standard of review or citation to any

legal authority. The sentencing issues raised in appellant's brief are deemed waived. If we reviewed the sentencing issues, we would nonetheless find no error.

### 1. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-102, -103, -113, -114, -210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When imposing a sentence within the appropriate range of punishment for a defendant,

> the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)     The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2)     The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210 (2010). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, 40-35-210(c) (2010). The 2005 amendments set forth

certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Id*. at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

Additionally, when a trial court orders a sentence involving confinement, the court should consider whether: (A) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" (B) "confinement is necessary to avoid depreciating the seriousness of the offense" or to "provide an effective deterrence to others likely to commit similar offenses;" or (C) less restrictive measures have been frequently or recently applied to defendant unsuccessfully. Tenn. Code Ann. § 40-35-103(1) (2010).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 WL 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 17. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## 2. Trial Court's Finding as to Range of Punishment

Appellant maintains that the trial court erred in accepting evidence of prior convictions in the form of a certified packet of information from North Carolina, commonly known as a "pen pack." He claims that the evidence is unreliable because it does not contain sufficient identifying information such as docket numbers and dates of convictions. We disagree.

The certified packet included copies of photographs/mug shots, fingerprints, and copies of the judgments of conviction, including dates of offenses. The presentence report further detailed appellant's lengthy criminal history, which also included docket numbers, dates of offenses, and dates of dispositions.

In reviewing the propriety of a trial court considering prior convictions that are not established by certified copies of judgments, this court reasoned:

> Under the Tennessee Rules of Evidence, properly certified copies of judgments of conviction or of other official records showing such convictions would be admissible as an exception to the hearsay rule of exclusion. *See* Tenn. R. Evid. 803(22), 901 and 902. It is such a document that the defendant claims should have been used in this case. However, by T.C.A. § 40-35-209(b) allowing "reliable hearsay" other than that allowed by the rules of evidence, the legislature apparently did not intend such a restriction. Further, although "certified copies of convictions" are included in § 40-35-209(b) as an explicit example of reliable hearsay, we do not read the statute to mean that use of a certified copy is the only admissible documentary method of proving the existence of a conviction for sentencing purposes under a preponderance of the evidence standard.
>
> In this respect, we do not believe that the legislature contemplated that a trial court must exclude from the evidence or refuse to consider information about prior convictions solely because it is only contained in a presentence report. Unless the parties agree to a specific sentence in a felony case, a presentence investigation must be conducted and a report made to the trial court. T.C.A. § 40-35-205(a) and (d). The report must contain the defendant's record of prior convictions. T.C.A. § 40-35-207(a)(4). At the conclusion of a sentencing hearing, in determining an appropriate sentence, the trial court must consider the presentence report and the sentence is to be based in part upon that report. T.C.A. § 40-35-210(b)(2) and (g).

> Obviously, these statutes contemplate the use of presentence investigative procedures which assure the acquisition of reasonably reliable information and it is incumbent upon the trial court to insure that such procedures are used. However, we see little problem in concluding that a trial court is in the best position to know the procedures used by presentence officers in his or her court and is entitled to rely on such a report's contents, absent a showing that the report is based upon unreliable sources or is otherwise inaccurate. Such a showing may occur through the report, itself, or through other evidence submitted at the sentencing hearing.

*State v. Richard J. Crossman*, No. 01C01-9311-CR-00394, 1994 WL 548712, at *5-6 (Tenn. Crim. App. Oct. 6, 1994).

Based on this rationale, we conclude that the trial court's reliance on certified documents from North Carolina and the presentence report was proper. Both the documents from North Carolina and the presentence report contained identifying information such as docket numbers, dates of offenses, dates of conviction, and sentences imposed. The information was sufficient for the court to ascertain which felonies could properly be considered. As evidence thereof, the trial court excluded one of the felony drug convictions because it bore the same offense date as another conviction. The evidentiary record establishes that appellant had at least two requisite felony convictions in his criminal history to satisfy the statutory requirement for sentencing as a Range II offender. While some of appellant's convictions are listed in the presentence report without corresponding documentation from North Carolina, the two sources of information taken together provide a comprehensive criminal history on which the trial court properly relied in sentencing appellant as multiple offender. Appellant neither raised an argument concerning the presentence report or the investigative methods utilized in researching his criminal history nor presented evidence tending to demonstrate the report's unreliability or inaccuracy. Appellant has not met the burden of establishing that the trial abused its discretion in sentencing him as a Range II offender. Therefore, the trial court properly sentenced appellant.

### 3. Trial Court's Consideration of Mitigating Factor

Appellant cites as error the trial court's failure to attribute weight to the mitigating evidence he presented at the sentencing hearing. The trial court found the following statutory enhancement factors: Number (1): The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and Number (8): The defendant, before trial or sentencing, has failed to comply with the conditions of a sentence involving release into the community. Tenn. Code Ann. § 40-

35-114(1), (8) (2010). Appellant urged the court to consider the fact that he immediately summoned help for the victim upon realizing he ran over her as a mitigating factor.

A trial court's weighing of enhancing and mitigating factors is entrusted to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345; *see also* Tenn. Code Ann. § 40-35-210 (2010), Sentencing Comm'n Commt; *State v. Kelley*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000) ("weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record"). Because enhancing and mitigating factors have been rendered merely advisory by the revised Sentencing Act, the trial court's discretion has been broadened. *Carter*, 254 S.W.3d at 345. In considering the enhancing and mitigating factors, the trial court gave particular weight to (1), appellant's long history of domestic violence. *See* Tenn. Code Ann. § 40-35-114(1) (2010). In considering appellant's request to consider his flagging down a passing motorist as a mitigating factor, the trial court found the proffered evidence "unconvincing."

Our supreme court has reiterated the deference to be given to a trial court's sentencing decision, stating that "if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred." *State v. Ralph*, 347 S.W.3d 710, 717 (Tenn. 2010) (citing *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991)). The trial court followed the statutory procedure for sentencing and appropriately considered applicable sentencing principles, thus, we attribute a presumption of reasonable to the trial court's sentencing order. Because the trial court imposed a lawful sentence, we uphold the sentence.

## CONCLUSION

We have thoroughly reviewed the record and have considered the briefs of the parties and applicable law. After due consideration, we discern no error in the trial court requiring reversal of appellant's conviction and sentence.

Therefore, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE