STATE of Tennessee

v.

Wanda G. AYERS.

Court of Criminal Appeals of Tennessee,
at Nashville.

Assigned on Briefs June 21, 2005.

Oct. 11, 2005.

Application for Permission to Appeal
Denied by Supreme Court
March 27, 2006.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attoney General; John H. Carney, District Attorney General; and Dan Brollier, Assistant District Attorney General, for the appellant, State of Tennessee.

Peter Olson and Tim Wallace, Clarksville, Tennessee, for the appellee, Wanda G. Ayers.

**OPINION**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and J.C. McLIN, JJ., joined.

In March of 2002, the defendant, Wanda G. Ayers, was indicted for first degree murder, a class X felony, a crime which allegedly occurred in 1983. *See* Tenn. Code Ann. § 39–2–202 (1982). The trial court granted a defense motion in limine to exclude expert testimony regarding the manner of death of the deceased. In this extraordinary appeal by the state, the single issue is whether the trial court properly excluded the testimony. Because it is our view that the trial court erred, the order is reversed and the cause is remanded for trial.

In 1983, Robbin C. Cooper, who was then married to the defendant, Wanda Gail Ayers, died of a gunshot wound to his abdomen. Cooper, an off-duty police officer, and the defendant had just returned to their home following a party at the residence of a friend. According to the defendant, she went to the bedroom of their two-year-old child, who was not at home at the time, while the deceased walked to another room. She claimed that she heard a gunshot and immediately fled the residence in order to call for help. It was her contention that she and the deceased had a good relationship that night and that there were no indications that he might commit suicide.

Soon after the death, Dr. James Bellenger, the medical examiner of Montgomery County, examined the body. Although he was unable to determine the manner of death, he did describe the type of death as "suspicious, unusual or unnatural." It was his opinion that the death could have been accidental, homicide, or suicide. A coroner's inquest was conducted and, after the examination of several witnesses, the jury found that "there was insufficient evidence presented to determine if the death was self-inflicted or inflicted by a person or persons unknown." *See* Tenn.Code Ann. §§ 38–5–101 to –121.

In March 2002, almost twenty years after the deceased's death, the defendant was indicted, the body was exhumed, and a second autopsy was performed. Dr. Bruce Levy conducted the second autopsy and concluded that the death occurred as a result of homicide. In a motion in limine, the defense argued that the state intended to rely upon Dr. Levy's opinion, which was not grounded in fact or scientific principles.

At the hearing on the motion, Dr. Levy, a forensic pathologist and chief medical examiner for the state, testified that he had conducted approximately 3,500 autopsies and supervised several thousand more. He recounted his extensive education, training, and experience in the field of forensic pathology. He stated that in connection with the autopsy in this case, he had examined twelve photographs taken of the deceased at the time of his death, he had read the coroner's inquest transcript, and he had reviewed the report prepared by Dr. Bellenger. Dr. Levy, who had been asked to investigate the circumstances of

the deceased's death by the Tennessee Bureau of Investigation, stated that the body of the deceased was in an "excellent state of preservation" and that he was able to visualize the stippling around the wound to the abdomen. He made the following observations with regard to the damage done by the gunshot:

Stippling in terms of clothing would be small defects in the clothing and in terms of the skin it would be small abrasions or tears, lacerations of the skin caused by fragments of burning gunpowder, unburnt gunpowder and any other type of debris that might be in the weapon that is propelled out at the same time as the bullet. Grease or dirt or things of that nature....

Dr. Levy estimated that the deceased had been shot from a distance of six inches to two feet but more likely closer to six inches. It was his opinion that the manner of death was homicide. He explained his opinion as follows:

First, the injury was clearly not an injury that was a contact range. It was an intermediate range [wound] of six inches or greater from the body at the time that the gun was fired. The location of the wound was a location that is very unusual in cases of suicide, fewer than about one-half of one percent of all handgun suicides are shots to the abdomen. About one percent of suicidal handgun wounds are also not contact. So those were two factors of physical evidence that spoke against this being a self-inflicted wound.

The position of the body from the photographs [ ] of the scene, the pattern of blood on Mr. Cooper's shirt was [consistent] with him being in a lying position at the time that he was shot. The presence of the weapon from underneath his left hand on the floor when he was right-handed is also an unusual finding

in self-inflicted gunshot wounds. There was no[ ] reported history anywhere in the records of depression or suicide ideation, which are softer factors, but again, factors that I did consider.

And based on all that, it was my opinion that Mr. Cooper did not shoot himself and therefore, he was shot by another person and that would make it by definition of a medical examiner, a homicide.

Dr. Levy testified that his opinions were based upon recognized principles within the forensic pathology community. He stated that he relied on statistical information published in three textbooks used by forensic pathologists throughout the country.

When asked on cross-examination whether he would be able to rule out accidental death or suicide without the studies referenced in the textbooks, Dr. Levy contended that his opinion was also based upon his "own experience in thousands of autopsies." He explained that he had never seen anyone commit suicide by a shooting in the abdomen from such a distance.

The trial court excluded the evidence. Its basis for exclusion were Rules 403, regarding the exclusion of relevant but unfairly prejudicial or confusing evidence, and 702, which relates to expert testimony, of the Tennessee Rules of Evidence.

 Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appeal, "[t]he abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Coley*, 32 S.W.3d 831, 833 (Tenn.2000) (quoting *State*

*v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999)); *see also State v. Shuck,* 953 S.W.2d 662, 669 (Tenn.1997).

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 264 (Tenn.1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

In *McDaniel,* our supreme court concluded that to determine "the standard of admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence." 955 S.W.2d at 264. Our high court observed that Rule 702 requires that the evidence "substantially assist the trier of fact," while the federal rule requires only that the evidence "assist the trier of fact." *Id.* The court concluded that the probative force of expert testimony must be stronger in this state's courts than under the federal rules. *Id.* Rule 703 provides that trial courts " 'shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.' " *Id.* (quoting Tenn. R. Evid. 703). Even if expert testimony tends to provide substantial assistance to the jury, the testimony is admissible only if it is based upon reliable facts or data. *Shuck,* 953 S.W.2d at 668.

"To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation. The expert must possess a thorough knowledge upon which he testifies that is not within the general knowledge and experience of the average person." *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 443 (Tenn. 1992) (citing *Kinley v. Tennessee State Mut. Ins. Co., Inc.,* 620 S.W.2d 79, 81 (Tenn.1981)). Evidence regarding statistical probabilities is outside the common understanding of the jury. *State v. Ward,* 138 S.W.3d 245, 275 (Tenn.Crim.App.2003). Further, Tennessee Rule of Evidence 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

As indicated, Rule 403 pertains to the relevance of testimony:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence.

Tenn. R. Evid. 403.

Here, the trial court's primary concerns were the trustworthiness of the statistical studies relied upon by Dr. Levy and whether the testimony would substantially assist the trier of fact to understand the evidence or to determine a fact in issue, as required by Tennessee Rule of Evidence 702. The trial court's sole ground for excluding the testimony under Rule 403 was that the probative value of the testimony was substantially outweighed by the danger of misleading the jury.[1] Again, the court's concern was with the statistical studies referenced by Dr. Levy.

When deciding to exclude Dr. Levy's opinion that death was the result of homicide, the trial court relied upon our decision in *State v. Ward.* In *Ward,* two doctors, including Dr. Levy, testified as to the manner of death. Their testimony was rooted in a theory known as the "rule of three." According to that theory, whenever three or more deaths of children under the care of a single caretaker occur where there is no known disease, trauma, or explanation for the deaths, the deaths are ruled homicides. The first death would initially be classified as sudden infant death syndrome (SIDS); upon a second death, although a SIDS classification would be appropriate if it were the first death, the death would be classified as uncertain or undetermined; but in a third death and subsequent deaths, the manner of death would be homicide, and the manner of death determined in the previous two deaths would be reclassified to homi-

cide. Holding that the "rule of three" was not a proper foundation for expert opinion testimony, the trial court in a pre-trial hearing prohibited the experts in the case from mentioning the "rule of three" at trial but allowed the experts to render opinions as to cause of death. On appeal, however, this court found that the "rule of three" was "[c]ritical to the basis and foundation of each expert witness's conclusion" at trial even though neither of them made specific reference to the term. 138 S.W.3d at 268. Because the opinions offered at trial were based solely upon an improper foundation, the convictions were reversed and the case was remanded for a new trial. *Id.* at 272.

Here, the circumstances are distinguishable. The threshold question is whether death was the result of homicide. In that regard, the testimony would provide substantial assistance to the trier of fact. Moreover, Dr. Levy's testimony is not entirely dependent upon statistical studies as was his testimony in *Ward.* He specifically contended that his observations, skill, training, and experience were a separate basis for his opinion. As a basis for his opinion, Dr. Levy explained, "The photographs which showed his hands, wrists and forearm area, showed an absence of any gun powder residue or any stip[p]ling caused by the cylinder gap in a revolver and that indicated ... that the weapon was not in his hands at the time that it was fired." He testified that he had studied many still shots of weapons just after having discharged a bullet and that he had always observed a cloud of soot that is discharged simultaneously with the bullet. It was his conclusion, based upon experience and training, that soot would have

---

1. "[T]he rule suggests that the evidence is to be admitted unless the other listed considerations greatly outweigh the probative value of the evidence. This approach means that Rule 403 'is an extraordinary remedy that should be used sparingly.' If the balance is close, the evidence should be admitted. By adopting the 'substantially outweighed' test, Rule 403 places a significant burden on the party who wants evidence excluded." Neil P. Cohen et al., Tennessee Law of Evidence § 4.03[4], at 4–54 (4th ed.2000) (footnote omitted).

been visible on Mr. Cooper's forearms, wrists, and hands had he shot himself. That there would be some amount of residue on Mr. Cooper's arms is not an opinion dependent on any statistical probabilities.

Furthermore, although experts' opinions must be based on trustworthy information, experts are permitted to rely on the work of others in the field. *See* Tenn. R. Evid. 702, 703. Experts are not required to have personally reproduced the results of every study upon which they rely, nor are they required to validate every aspect of each study. During intense cross-examination, Dr. Levy stated as follows:

> I would repeat that these studies have been subjected to peer review. They're in journals published by professional organizations in the forensic sciences; they are text books that are accepted and used by every forensic pathologist in the United States, and it would be impossible for any forensic pathologist to have to independently validate every single paper that has ever been published in forensic pathology before they could use it for their information. That would mean we would spend all of our time just reviewing everybody else['s] work. We would never be able to do our own work.

Testimony is excluded, based on Rule 703, only when the underlying facts indicate a lack of trustworthiness. *Id.* Our supreme court in *McDaniel* listed the following nonexclusive factors that trial courts may consider when determining whether the data and facts underlying expert opinion testimony indicate a lack of trustworthiness:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . .

the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel,* 955 S.W.2d at 265.

■ Dr. Levy testified that the studies upon which he relied are published in textbooks "used by every pathologist in the United States." It was also his view that the studies had survived the scrutiny of peer review and that the studies were of the type relied upon by other experts in the field of forensic pathology. Furthermore, the research leading to the criteria for distinguishing between homicides and suicides was obviously conducted independently of this prosecution. These considerations lead us to conclude that the studies relied upon are trustworthy. Nothing in the record indicates otherwise.

■ "[T]he weight to be given [expert testimony] is a question for the jury under careful instruction of the trial judge." *Mullendore v. State,* 183 Tenn. 53, 62, 191 S.W.2d 149, 152 (1945); *see also State v. Sparks,* 891 S.W.2d 607, 616 (Tenn.1995); *State v. Anderson,* 880 S.W.2d 720, 732 (Tenn.Crim.App.1994). The trial court's concern with a jury "find[ing] guilt based on probabilities and odds rather than on the mandated standard of proof beyond a reasonable doubt" may be resolved with appropriate jury instructions or by exclusion of the foundation testimony. "If the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction." Tenn. R. Evid. 702, Advisory Commission Comment. The defendant, of course, will have an opportunity at trial to thoroughly cross-examine Dr. Levy on his expert opinion, as well as present experts of her own. The ultimate question, in our view, is one for the jury.

Accordingly, the judgment of the trial court is reversed and the cause is remanded.